ECONOMY CASH & CARRY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Economy Cash & Carry, Inc. v. Commissioner
Docket No. 7373-73.
United States Tax Court
T.C. Memo 1976-280; 1976 Tax Ct. Memo LEXIS 123; 35 T.C.M. (CCH) 1253; T.C.M. (RIA) 760280; September 2, 1976, Filed Towner Leeper, for the petitioner. Bernard B. Nelson, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent has determined deficiencies in the income taxes of petitioner for its fiscal years ending June 30, 1969 and June 30, 1970 in the amounts of $11,833.99 and $24,227.72, respectively. Due to concessions, the sole issue remaining is whether payments to one of petitioner's officers constituted reasonable compensation for services actually rendered within the meaning of section 162(a)(1). [1]
FINDINGS OF FACT *124 Some facts were stipulated and are so found. Petitioner, Economy Cash & Carry, Inc., (Economy) is a Texas corporation with its principal place of business at El Paso, Texas, at the time the petition herein was filed. Petitioner filed its returns with the District Director of Internal Revenue, Austin, Texas, for the years in issue. Since its inception in 1958, Economy has been engaged in the wholesale grocery business. While petitioner carries about 5,000 different items, approximately 15 basic food items account for the majority of its business. Most of Economy's customers are Mexican nationals with retail stores in border towns such as Juarez. [2] Since its inception, Economy has never paid a dividend to its shareholders. During the years at issue and somewhat before, the outstanding capital stock of Economy was held as follows: 10/8/64
7/1/68
10/1/68
to
to
to
Name of [3]
6/30/68
9/30/68
6/30/70
Officer
Title
Shares
%
Shares
%
Shares
%
Sam Sayklay
President
177
25.6
177
19.8
177
16.2
Joe Sayklay
Vice-
115
16.6
115
12.9
115
10.5
President
Mike Dipp
Secretary-
400
57.8
600
67.3
800
73.3
Treasurer
Total
692
100.0
892
100.0
1,092
100.0
*125 Petitioner paid the following salaries and bonuses to its officers from 1967 through 1970: Officers' Compensation
Mike [4]
Sam
Fiscal
Year
Salary
Bonus
Total
Salary
Bonus
Total
1967
$3,600
$18,000
$21,600
$21,600
$10,800
$32,400
1968
3,600
13,000
16,600
21,600
7,800
29,400
1969
3,600
28,500
32,100
21,600
17,250
38,850
1970
3,600
50,000
53,600
21,600
30,000
51,600
Joe
Fiscal
Year
Salary
Bonus
Total
1967
$17,400
$7,200
$ 24,600
1968
17,400
5,200
22,600
1969
17,400
11,750
29,150
1970
17,400
20,000
37,400
Total Officers' Compensation
1967
$ 78,600
1968
68,600
1969
100,100
1970
142,600
The three officers performed various duties for Economy. Sam Sayklay (Sam) as president was in charge *126 of general administration. He also acted as buyer for Economy. His buying decisions, however, were subject to guidance and review by Mike Dipp. Joe Sayklay (Joe) is Sam's brother. Joe was mainly responsible for warehouse operations, supervising the inflow and outflow of merchandise. Neither Sam nor Joe are related to Mike Dipp. Mike Dipp (Dipp), the secretary-treasurer of Economy, was a man of substantial financial means with over 40 years of experience in the grocery business. As secretary-treasurer and in effect Economy's chief executive, Dipp had multiple responsibilities.Dipp authorized all checks issued by Economy except payroll; he was responsible for obtaining financing for Economy and personally guaranteed certain corporate obligations. Additionally, Dipp's duties included responsibility for accounts receivable and accounts payable. In order to effectively utilize Economy's available cash so as to achieve the maximum discount on merchandise purchased, Dipp used a method of short-term financing known as a "cash float". Using this method, Economy would write checks without sufficient funds in the bank, and depend upon collecting enough accounts receivable to deposit *127 with the payor bank before the outstanding checks were presented for payment. [5] Although overdrafts did occur, they were of short duration and checks presented for payment in the interim were honored by the bank. The majority of Economy's credit sales were to Mexican nationals on open account, a practice avoided by Economy's competitors and advised against by its bank, as the bank believed that open account debts were unenforceable in Mexico. Dipp personally conducted this phase of Economy's operation. Owing to the erratic business climate in Juarez, Dipp traveled there every Sunday to personally investigate prospective credit customers, collect overdue accounts, and revise credit limits accorded existing customers. [6]
*128 While in Juarez, Dipp also acted as Economy's market analyst. This function involved checking current demand levels and general market prices, investigating new products and determining local harvest availability. From this information he advised Sam concerning inventory guidelines and general marketing strategy. Although Dipp had other business interests during the years in issue, he worked 6-8 hours for Economy every Sunday as well as 2-10 hours on Monday through Saturday, depending upon the needs of the business. In his notice of deficiency for each of the years in issue, respondent disallowed deductions by petitioner for compensation paid to Dipp in excess of $10,000. OPINION The issue presented is whether the amounts paid to Dipp during the years in issue constituted reasonable compensation for services actually rendered within the meaning of section 162(a)(1). The question is one of fact to be determined by the particular facts and circumstances of each case. , affd. . A rather comprehensive list of pertinent factors to be considered is found *129 in . While no one factor is conclusive and the weight accorded to each varies with the circumstances, we have incorporated into our analysis those factors enumerated in Mayson that we deem appropriate to the facts and circumstances at hand. Respondent maintains that amounts paid to Dipp were unreasonable since the services he performed as an employee of Economy consisted merely of reviewing accounts receivable, reviewing accounts payable, and collecting accounts receivable, functions traditionally performed by a corporate controller. In view of the unusual nature of petitioner's method of operation, however, we believe respondent's view to be uncognizant of the actual significance and scope of Dipp's responsibilities. Economy's business was heavily dependent on sales of merchandise to Mexican nationals, with credit sales accounting for a significant portion of this volume. Dipp's hard work and constant vigilance regarding every aspect of these sales was clearly responsible for Economy's success in the lucrative but volatile Juarez market. Credit decisions were based on his personal evaluation *130 of each customer. Dipp scrutinized accounts payable, accounts receivable, and the "cash float" during the week while collecting overdue accounts in Juarez on Sunday. Qualitative and quantitative inventory decisions were based on Dipp's weekly analysis of Juarez market conditions. Moreover, petitioner has introduced persuasive and convincing evidence that Dipp was the only officer with the expertise to administer this critical phase of its operation. [7]
Although Dipp did not devote all of his time to Economy, the record amply demonstrates that his qualifications, background, and expertise considerably enhanced *131 the value of his part-time efforts; rendering them at least as valuable as those of a full-time officer without such qualities. . [8]
Lastly, respondent contends that, though reasonable in amount, a portion of the payments to Dipp were in reality a non-deductible distribution of corporate earnings rather than compensation for services rendered. In support of this contention, respondent cites Dipp's personal guaranty of certain corporate obligations and his purchase of additional stock during the years in issue, arguing that such activities are usually associated with shareholder status and indicate petitioner's intention to compensate Dipp in his capacity as such. [9]
*132 On both scores, however, we fail to see any correlation between Dipp's activities as a shareholder and any payments received; rather, we are convinced that such payments were made solely on the basis of employment-related criteria. Although it appears that Dipp guaranteed corporate obligations on a regular basis, the record is void of any evidence indicating that it was petitioner's intention to compensate Dipp for his services as guarantor. Cf. , cert. denied . [10]
Nor does the fact that Dipp's compensation increased substantially during the years in which he purchased additional stock indicate that the payments were a disguised distribution of earnings. Although Dipp increased his holdings to a 73 percent equity interest, he never received more than 38 percent of the compensation paid to all three employee shareholders during the years in issue. Moreover, most of Dipp's *133 compensation was in the form of a bonus, which would naturally fluctuate from year to year, with generous compensation in good years and moderate compensation in poor ones. . We therefore hold the payments were reasonable in amount and made solely on the basis of employment-related considerations. Accordingly, the deductions claimed by petitioner for compensation for services rendered during the years in issue were proper. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all references are to the Internal Revenue Code of 1954, as amended.↩
2. Economy's gross sales in fiscal years 1969 and 1970 were $7,349,322.70 and $9,681,564.87, respectively. Total sales to Mexican nationals accounted for 80 percent of this volume in 1969 and 82 percent in 1970. Credit sales to Mexican nationals accounted for 32 percent and 45 percent of gross sales during the same period.↩
3. The three officers also served as the board of directors for Economy.↩
4. An aggregate bonus amount to be divided among all officers was determined approximately six months into each fiscal year. Pursuant to an allocation established in 1967, the bonus amount determined for each year was divided thus: Dipp (50%); Sam (30%); Joe (20%).↩
5. Economy apparently experienced cash flow problems during the years in issue. Balance sheets for the period reflect a capital account of approximately $300,000, while gross sales were 7 to 9 million dollars annually.↩
6. In this regard we note particularly the following testimony of Dipp: Q Now, how do you determine whether or not to extend credit to a particular individual in Juarez, for example? A Well, I'm well acquainted with all of the customers. I conduct my own -- you might say my own Dun and Bradstreet investigation, personally. Q How do you do that? A I go to their place of business, I know what they have in merchandise, I know the person that runs it, I know whether the person that runs it gambles, whether he drinks, whether he's going up or he's going down in his business. I evaluate each person, person by person -- that's the only way you can do it. Q Well, do you know every one of the -- your customers? A Every one that's -- that owes us money, yes. Q Personally? A Yes.↩
7. At trial respondent introduced into evidence the testimonv of a former controller for one of Economy's competitors for the purpose of establishing the prevailing rate of compensation paid in the same geographic area for services comparable to those performed by Dipp. We are not unmindful of the weight usually attributed to such a comparison. However, in view of the additional and somewhat unique services performed by Dipp, his additional qualifications, and the structural differences between the corporations, we find the comparison to be unhelpful in this instance.↩
8. While Sam in effect functioned as Dipp's assistant, he received aggregate compensation of $90,450 compared to $85,700 paid to Dipp during the two fiscal years in issue. See ; Saia Electric Inc. v. Commissioner,↩ F.2d (5th Cir. Jul. 16, 1976), affg. per curiam a Memorandum Opinion of this Court.
9. Respondent relies heavily on the recent decisions in ; and , affg. a Memorandum Opinion of this Court. However, in both McCandles and Nor-Cal the officer-shareholders received compensation proportionate to their stock ownership and all↩ officer-shareholders were held to have received a dividend distribution in part.
10. Nor is it a certainty that we would consider such a payment to be a distribution of corporate earnings if so made. See .↩